******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* QUAVON TORRES
(AC 39796)

Lavine, Keller and Bishop, Js.

*Syllabus*

Convicted of the crimes of murder and carrying a pistol without a permit, the defendant appealed. The defendant's conviction stemmed from his alleged conduct in shooting the victim while near a drive-through at a fast food restaurant. On appeal, he claimed that the first time in-court identification of him as the shooter by an eyewitness, J, violated his right to due process and should have been excluded pursuant to *State* v. *Dickson* (322 Conn. 410), which was decided during the pendency of this appeal. In *Dickson*, our Supreme Court held that in cases in which identity is an issue, a first time in-court identification by a witness who would have been unable to make a reliable identification of the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation. Although J had provided a statement to police several hours after the shooting, when shown two photographic lineups, one of which included the defendant's photo, she was unable to identify anyone as the shooter. Almost two years prior to trial, the defendant's original trial counsel had filed a motion to suppress any out-of-court identification of the defendant, but the motion was never ruled on by the trial court, the defendant's subsequently appointed counsel did not request that the court rule on the motion, and the defendant did not object at the time that J made her in-court identification of him. *Held*:

1. Contrary to the claim of the state, the defendant did not waive his claim that J's in-court identification of him was unreliable and should have been excluded; because there was no evidence that, prior to J's in-court identification, there had been any suggestive out-of-court identification procedure and, given the state of the law at the time of the pretrial hearing and the in-court identification, J's identification of the defendant was permissible, the defendant would have had no reason to believe that objecting to the identification would provide him any relief, and, therefore, he could not have waived his claim, especially given that he did not know at the time of his trial that he had a right to be free from first time in-court identifications.

2. J's first time in-court identification of the defendant violated the defendant's right to due process as set forth in *Dickson* and should not have been admitted: given that J's in-court identification of the defendant was preceded only by her unsuccessful attempt to identify the defendant in a photographic lineup and that the identity of the shooter was in dispute, the principles set forth in *Dickson* applied, and where, as here, J had the opportunity, shortly after the incident, to identify the defendant in a photographic lineup but was unable to do so, and her description of the shooter at the time of the incident was vague and included a description of the shooter's clothing, approximate age, height, build, and race, the record was adequate for this court to determine that J's in-court identification of the defendant, made two years later, was unreliable; moreover, the admission of the identification was not harmless beyond a reasonable doubt, as the state's case would have been considerably weakened without J's testimony identifying the defendant as the shooter in that the case was full of inconsistent statements and contradictory testimony, the jury had requested to hear a playback of J's testimony only, indicating that it considered the testimony to be important, and, in the absence of J's identification of the defendant, the state's case was not so overwhelming that it was clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible evidence.

Argued February 15—officially released August 1, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol without a

permit, brought to the Superior Court in the judicial district of New Haven, geographical area number twenty-three, where the defendant filed a motion to suppress identifications; thereafter, the case was tried to the jury before *Blue, J.*; verdict and judgment of guilty; subsequently, the court denied the defendant's motions for judgment of acquittal and for a new trial, and the defendant appealed. *Reversed*; *new trial*.

*Jennifer B. Smith*, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Patrick Griffin*, state's attorney, *Gary Nicholson*, supervisory assistant state's attorney, and *Michael Dearington*, former state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Quavon Torres, appeals from the judgment of conviction, rendered after a jury trial, of murder pursuant to General Statutes § 53a-54a and carrying a pistol without a permit pursuant to General Statutes § 29-35 (a). He claims on appeal that an eyewitness' first time in-court identification of him as the shooter should have been excluded pursuant to our Supreme Court's decision in *State* v. *Dickson,* 322 Conn. 410, 141 A.3d 810 (2016), cert. denied,       U.S.      (June 19, 2017) (No. 16-866).[1] We agree and reverse the judgment of the trial court.

The jury reasonably could have found the following facts. On July 23, 2012, the defendant and two other young men, Marcus Lloyd and Freddie Pickette, were at 541-543 Orchard Street in New Haven, where the defendant's cousin, Tasia Milton, lived. One of them called the victim, Donald Bradley, on the phone to ask for a ride to Farnam Courts, also in New Haven. The victim parked his car, a four door Honda Accord, in the CVS Pharmacy parking lot, across the street from 541-543 Orchard Street, and went inside CVS Pharmacy. While the victim was in the store, the three men entered his car. Pickette sat in the front passenger seat, Lloyd sat in the rear passenger side seat behind Pickette, and the defendant sat in the rear driver side seat. The victim exited CVS and entered his car, sitting in the driver's seat, directly in front of the defendant. Pickette recommended that they go to the Burger King, which was very close to the CVS Pharmacy on Whalley Avenue, to get some food on their way to Farnam Courts.

While in the drive-through line, but before ordering, the victim, then realizing that the defendant was in the car, told him to leave. When the defendant did not leave, the victim got out of the car and walked over to the passenger side. He leaned into the car, either in the front passenger seat, where Pickette was seated, or the rear passenger seat, where Lloyd was seated.[2] The defendant exited the car and walked toward the victim on the passenger side of the car. The victim was then fatally shot. The defendant, Lloyd, and Pickette exited the car and ran.

The police arrived on the scene at approximately 7:20 p.m., and the victim was transported to the hospital, where he ultimately died from multiple gunshot wounds. The police were advised he was pronounced dead at 7:51 p.m., and received information that two suspects were inside the house at 541-543 Orchard Street. By 9 p.m., the police had the house surrounded. Eventually, the defendant and Lloyd emerged from the house, and they were arrested. The police obtained a search warrant for the third floor of the building and seized, among other items, a .38 caliber Colt revolver containing two live rounds. The weapon was later iden-

tified as the gun from which three of the four bullets found in the victim were fired.[3]

Several hours after the shooting, two eyewitnesses, Theresa Jones and Lachell Hall, provided statements to the police. Jones reported that she saw the shooting while standing across the street from the Burger King at a Stop & Shop grocery store. She told the police in her initial statement that three black men had been arguing around a car that was parked in the drive-through lane at Burger King, and after the shooting, they ran from the back of the car, past the front of Burger King toward Orchard Street. She was shown a photographic lineup, and identified Pickette, whom she knew, and told the police that the shooter looked like Pickette. She was then shown another photographic lineup, which included the defendant's photograph, and she was unable to identify anyone as the shooter. She described the shooter as thin, about five feet seven or eight inches tall, and wearing a blue shirt.

Hall had been standing outside of a deli near the Burger King at the time of the shooting. She recognized Pickette, her nephew, in the front passenger seat of the vehicle wearing a black T-shirt. She said that the victim got out of the car from the driver's seat and walked around the back of the car, and she recognized him as someone she knew. She told the police that the person in the rear driver's side seat got out of the car, went around the back of the car to the passenger side, and then the shooting began. She was shown a photographic lineup and was unable to identify the shooter, although she identified Pickette's photograph from a separate photographic lineup and told the police that he was not the shooter. She described the shooter as a skinny black male, around five feet seven inches tall, wearing a black T-shirt.

Lloyd told the police that he did not see who shot the victim and that he and Pickette left the car and were walking toward the front of the Burger King when they heard gunshots. He later changed his story and said that he was still in the car when the defendant got out of the car on the driver's side and, without going around to the other side of the car, shot the victim, who was standing on the passenger side of the car. He then chose Pickette from a photographic lineup and wrote "Fred was just in the car." Lloyd chose the defendant from an additional photographic lineup and identified him as the shooter. Pickette gave a statement to the police the day after the shooting and also chose the defendant's picture from a photographic lineup and identified him as the shooter.

Milton, who lived on the third floor of the Orchard Street house, gave a videotaped statement to police at 3:30 a.m. on July 24, 2012. She told police that she was on the front porch of her house with the defendant, Lloyd, Pickette, and the defendant's sister, Amber Tor-

res, when someone came to pick up the three men. She remained on the porch and shortly thereafter heard gunshots. She then ran up to the third floor, and as she was running up the stairs, the defendant and Lloyd came running up behind her. She stated that while running up the stairs with them behind her, she was still hearing gunshots. She told the police that she saw the defendant give Amber the gun, and later testified that Amber had the gun while they were in Milton's bedroom. She also told the police and testified that the defendant told Amber to "do something with it."

The defendant was subsequently charged on July 23, 2012, with murder and carrying a pistol without a permit. Trial began on August 14, 2014. At trial, many witnesses testified, including Jones who, though unable to identify the shooter in a photographic lineup shortly after the incident, identified the defendant as the shooter in court during her testimony. During deliberation, the jury requested to hear a playback of Jones' testimony.

On August 25, 2014, the jury found the defendant guilty of murder pursuant to § 53a-54a and guilty of carrying a pistol without a permit pursuant to § 29-35 (a). At sentencing, on November 7, 2014, the defendant moved for a new trial. The court, *Blue, J.*, denied the motion and sentenced the defendant to forty-five years of incarceration and ten years of special parole on the murder conviction, and five years of incarceration, to run concurrently, on the conviction of carrying a pistol without a permit. The total effective sentence was forty-five years of incarceration and ten years of special parole. This appeal followed.[4] Additional facts and procedural history will be set forth as necessary.

The defendant claims that Jones' first time in-court identification of him as the shooter should have been excluded pursuant to our Supreme Court's decision in *State* v. *Dickson*, supra, 322 Conn. 410. In response, the state argues that the defendant waived this claim. We disagree with the state that the claim was waived and agree with the defendant that the identification should have been excluded.

I

We discuss first the state's argument that the defendant waived his claim that Jones' in-court identification of him was unreliable, and, therefore, should have been excluded.

The following additional facts and procedural history are relevant to our analysis. Almost two years prior to trial, on October 24, 2012, the defendant's original counsel filed a motion to suppress "any out-of-court and in-court identification of the defendant . . . ." The court did not rule on this motion, and the defendant subsequently was appointed new counsel. The day before the start of evidence, on August 13, 2014, the

court met with defense counsel and the state's attorney to discuss any outstanding motions. Defense counsel did not request that the court rule on the motion to suppress identifications, and the court did not rule on it. Thereafter, the trial began and at the time Jones made the in-court identification, the defendant did not object to the identification. On the basis of these two occurrences, the state argues that the defendant waived his claim that his due process rights were violated by this in-court identification. We disagree.

Waiver is "an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . ." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 469, 10 A.3d 942 (2011). Implicit waiver "arises from an inference that the defendant knowingly and voluntarily relinquished the right in question." (Emphasis omitted.) Id., 483. The court "will indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . [will] not presume acquiescence in the loss of [such a right]." (Internal quotation marks omitted.) *State* v. *Woods*, 297 Conn. 569, 583–84, 4 A.3d 236 (2010).

At the time of Jones' in-court identification of the defendant, the state of the law regarding first time in-court identifications was quite different than it is now, post-*Dickson*. See footnote 4 of this opinion. Our Supreme Court held, in *State* v. *Smith*, 200 Conn. 465, 469, 512 A.2d 189 (1986), that "an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification."

There was no evidence that prior to Jones' in-court identification of the defendant, there had been any suggestive out-of-court identification procedure. Therefore, at the time of the pretrial hearing and the in-court identification, Jones' identification was permissible, and, accordingly, the defendant would have had no reason to believe that objecting to the identification would provide him with any relief. Therefore, the defendant could not have waived this argument, as being free from first time in-court identifications was not a known right to him at the time of his trial. Accordingly, the defendant did not waive this claim.

## II

We turn now to the merits of the defendant's claim that Jones' first time in-court identification of him should not have been admitted pursuant to our Supreme Court's ruling in *Dickson*.

The following additional facts and procedural history are relevant to our resolution of this claim. In support of her identification of the defendant as the shooter, Jones testified that she saw the shooter's face during

the incident, but she found it difficult to pick someone out in a photograph. She further testified that she felt if she had seen him in person, she would have been able to identify him that night. Nonetheless, she did not identify the defendant as the shooter at any point prior to trial. When asked at trial if the shooter was in the courtroom, she answered "yes" and pointed out the defendant.

On appeal, the defendant claims that Jones' first time in-court identification of him as the shooter violated his right to due process under our Supreme Court's holding in *Dickson*, and, therefore should have been excluded. We agree.

We note first that "[w]hether [a party] was deprived of his due process rights is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *State* v. *Dickson*, supra, 322 Conn. 423.

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 141, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

"The first suggestiveness prong involves the circumstances of the identification procedure itself . . . and the critical question is whether the procedure was conducted in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible. . . . If the court finds there was an unduly suggestive procedure, the court goes on to address the second reliability prong, under which the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Citations omitted; internal quotation marks omitted.) *State* v. *Dickson*, supra, 322 Conn. 421.

Turning to the suggestiveness prong, our Supreme Court recently has held that when the suspect's identity is at issue, a "first time in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation."[5]

Id., 426 n.11. In doing so, the court stated: "[W]e are hard-pressed to imagine how there could be a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person [whom] the state has accused of committing [a] crime, and then asking the witness if he can identify the person who committed the crime. . . . If this procedure is not suggestive, then *no* procedure is suggestive." (Emphasis in original; footnote omitted.) Id., 423–24.

In order to avoid such suggestive procedures, the court announced a new procedural rule: "In cases in which there has been no pretrial identification, however, and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court. . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue." (Citation omitted.) Id., 445–46. This procedural rule, the court stated, applied prospectively and to all cases pending on review. Id., 450–51.

In cases like the present one, where the suggestive in-court identification occurred before *Dickson* was decided, the court created an alternative procedure for reviewing courts to retroactively apply the *Dickson* principles and determine whether the suggestive in-court identification was nonetheless reliable and, therefore, admissible. "[I]n pending *appeals* involving this issue, the suggestive in-court identification has already occurred. Accordingly, if the reviewing court concludes that the admission of the identification was harmful, the only remedy that can be provided is a remand to the trial court for the purpose of evaluating the reliability and the admissibility of the in-court identification under the totality of the circumstances." Id., 452. Alternatively, if the record is adequate to make a determination as to the reliability and admissibility of the identification, then the reviewing court could make such a determination. Id., 452 n.35. The court in *Dickson* specifically highlighted a situation in which "the eyewitness had a full and fair opportunity to identify the defendant before trial and was unable to do so" as an example of an instance in which a reviewing court *could* make such a determination on the basis of the record. Id. ("[O]f course, if the record is adequate for review of the reliability and admissibility of the in-court identification, the reviewing court may make this determination. For example, if the eyewitness had a full and fair opportunity to identify the defendant before trial and was unable to do so, the reviewing court reasonably could conclude that the subsequent in-court identification was unreliable.")

Turning now to the present case, we first acknowl-

edge that the *Dickson* principles apply to Jones' identification of the defendant. Jones' in-court identification of the defendant was preceded only by her unsuccessful attempt to identify the defendant in a photographic lineup, and the identity of the shooter was in dispute. See id., 452–53. The record makes plain that Jones had the opportunity, shortly after the incident, to identify the defendant in a photographic lineup and she could not. Her description of the shooter at the time of the incident was vague and contained only a description of his clothing, approximate age, height, and build, and race. Therefore, the record is adequate for us to determine that her in-court identification of the defendant, two years later, was unreliable.

Accordingly, we must determine now whether the admission of the identification was harmless. We conclude that it was not. "A constitutional error is harmless when it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible [evidence]. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citation omitted; internal quotation marks omitted.) Id., 453.

We note first that the jury undoubtedly considered Jones' testimony important because during deliberation it requested to hear a playback of her testimony, and did not request to rehear any other testimony. Additionally, without Jones' testimony identifying the defendant as the shooter, the state's case would have been considerably weakened. In addition to Jones, Hall testified about her eye-witness account of the incident. She testified that she saw the car park in the Burger King drive-through and recognized Pickette, her nephew, in the front seat of the car. She also recognized the victim when he got out of the front driver's side door and walked around the car to the passenger side of the car. She was about to go say hello but before she could, someone got out of the rear driver's side of the car, walked around the back of the car, and stood with his back facing her, and then the victim was shot. Hall testified that she was sure that the shooter was the person who got out of the car from the rear driver's side seat, but testified that she only told the police that "because when the person got out [of] the rear behind the driver, that's when the shooting started." She testified that she did not see the man who got out of the car raise his arm. She further testified that she did not see the gun, she did not see the shooter's face, and she could not identify the shooter. When asked whether she knew who shot the victim, she testified "I just know it was somebody in that car." Additionally, her description of the shooter wearing a black T-shirt contradicted Jones' testimony that the shooter wore a blue shirt.

Lloyd testified that he did not remember anything

about the shooting because he was intoxicated and under the influence of drugs that night. He testified that he did not see who shot the victim, and that his father, who was present at the police station during his statement, and the police pressured him to choose the defendant's picture. A redacted version of his videotaped statement was admitted at trial pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[6]

Pickette testified that he saw the defendant get out of the rear driver's side of the car and walk to the rear passenger side, where the victim was, but on cross-examination, testified that he did not see the defendant get out of the car because he was watching the victim who had come around the car to the passenger side. He testified multiple times that he did not see whether the defendant had a gun. He also testified on cross-examination that he did not see the victim get shot, but then later testified on recross-examination that he did see the defendant shoot the victim. He testified that after the shooting, he ran down the Burger King drive-through alley to Whalley Avenue and then down to McDonald's, not to Orchard Street with the defendant and Lloyd. Surveillance footage showed, however, that Pickette crossed Orchard Street and went through the CVS Pharmacy parking lot before retreating down Whalley Avenue.

Milton testified that she ran up to the third floor of her apartment building as soon as she heard gunshots, and as she was running up the stairs, the defendant and Lloyd were running behind her. She testified that she was still hearing gunshots as the defendant and Lloyd were behind her on the stairs. She also testified that she never actually saw the defendant with a gun, which conflicted with what she told the police, but just assumed that he was giving Amber a gun when she heard him tell her to "do something with it." She conceded on cross-examination that somebody, but she did not know who, gave Amber the gun. A redacted version of Milton's videotaped statement was admitted at trial pursuant to *State* v. *Whelan*, supra, 200 Conn. 743. See footnote 6 of this opinion.

Kristen Sasinouski, a forensic science examiner for the state of Connecticut, testified regarding the DNA and fingerprint evidence found on the gun. She testified that she tested three areas of the gun for DNA: the grip area, the cylinder area, and the trigger area. She also testified that two cartridges were swabbed for DNA as well, on which no DNA was found. She further testified that three DNA profiles were found on the gun, none of which was the defendant's.[7] When asked if that meant that the defendant necessarily did not touch the gun, she testified "[n]o, it does not." She did testify, though, that given the fact that the shooting occurred in hot weather in July, and that parts of the gun had an abrasive

surface, she would have expected to find DNA on the gun of someone who handled it.

Ultimately, the case was full of inconsistent statements and contradictory testimony, which raise substantial concerns. There was contradictory testimony about what color shirt the shooter was wearing, where the shooter was standing, where the victim was standing, and where the defendant, Pickette, and Lloyd ran after the shooting. Accordingly, without Jones' in-court identification of the defendant, the state's case was not so overwhelming that we can conclude "it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible [evidence] . . . ." (Internal quotation marks omitted.) *State* v. *Dickson*, supra, 322 Conn. 453. Therefore, the erroneous admission of Jones' in-court identification was not harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] The defendant also claims that the court abused its discretion in denying his motion for a new trial because the verdict was against the weight of the evidence, and seeks a reversal of his conviction and a remand for a new trial. Because we reverse the judgment on the basis of the erroneous inclusion of the first time in-court identification, we need not address this claim.

[2] The record is unclear as to why the victim went to the passenger side of the car, but a bat was later found on the floor of the back of the vehicle. Pickette told the police that he saw the victim retrieving the bat, but at trial he testified that he did not see the victim doing so. Lloyd told the police that the victim came to the passenger side of the car to retrieve the bat. Regardless of whether the victim sought to retrieve the bat, the defendant did not claim self-defense at trial.

[3] The defendant did not have a permit to carry a pistol.

[4] The defendant appealed to the Supreme Court. He submitted his brief to the court on April 29, 2016, in which he argued that Jones' first time in-court identification of him as the shooter was suggestive, and, therefore, should be analyzed for reliability on state constitutional grounds. He argued that the court should consider a number of different tests in doing so. While the defendant's appeal was pending, however, the Supreme Court released its decision in *State* v. *Dickson*, supra, 322 Conn. 410, in which it held that "in cases in which identity is an issue, in-court identifications that are not preceded by a successful identification in a nonsuggestive identification procedure implicate due process principles and, therefore must be pre-screened by the trial court." (Footnotes omitted.) Id., 415. In doing so, it overruled its prior decision in *State* v. *Smith*, 200 Conn. 465, 469, 512 A.2d 189 (1986), in which it had determined that "an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification."

Subsequently, the defendant moved that he be allowed to file a supplemental brief addressing the impact of *Dickson* on his case. The Supreme Court granted the motion on November 8, 2016, and ordered that the state also file a supplemental brief, responsive to the defendant's. The Supreme Court additionally transferred the defendant's appeal to this court. The defendant filed his consolidated reply and supplemental brief to this court on November 28, 2016. The state filed its supplemental brief thereafter.

[5] The court stated: "We agree that one-on-one in-court identifications do not always implicate the defendant's due process rights, as when identity is not an issue or when there has been a nonsuggestive out-of-court identification procedure. . . . [T]he specific question that we are addressing here [is] whether the trial court is constitutionally required to prescreen *first time* in-court identifications . . . ." (Emphasis in original.) *State* v. *Dickson*, supra, 322 Conn. 433.

[6] "[I]n *Whelan*, [our Supreme Court] held that a prior written inconsistent

statement of a nonparty witness is admissible for substantive purposes if the statement is signed by the declarant, who has personal knowledge of the facts stated, and the declarant testifies at trial and is available for cross-examination. See *State* v. *Whelan*, supra, 200 Conn. 753. This rule later was expanded to apply to tape-recorded statements that otherwise satisfy the *Whelan* criteria. E.g., *State* v. *Simpson*, 286 Conn. 634, 642, 945 A.2d 449 (2008)." *State* v. *Carrion*, 313 Conn. 823, 825 n.3, 100 A.3d 361 (2014).

[7] The defendant, the victim, and Lloyd were all eliminated as contributors of the DNA profiles found on the gun. A DNA sample was never taken from Pickette, however.

———————————————