STATE OF CONNECTICUT *v.*
QUAVON TORRES
(SC 20306)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.*

*Syllabus*

Convicted of the crimes of murder and carrying a pistol without a permit
in connection with the shooting death of the victim, the defendant
appealed to this court. The defendant, P, and L had been socializing with
M, the defendant's cousin, and the defendant's sister in an apartment.
L called the victim and asked him for a ride. The victim parked his car
outside of a pharmacy across the street from the apartment and went
inside of the pharmacy. The defendant, P, and L got into the victim's
car while the victim was inside the pharmacy. The victim returned to
his car and initially did not notice the defendant in the rear seat behind

* This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices McDonald, D'Auria,
Kahn, and Ecker. Thereafter, Justices Mullins and Keller were added to the
panel and have read the briefs and appendices, and listened to a recording
of the oral argument prior to participating in this decision.

343 Conn. 208 MAY, 2022 209

State *v.* Torres

the driver's seat. After the victim drove to a drive-through at a fast food restaurant, the victim noticed that the defendant was in the car and told him to get out. When the defendant refused, the victim got out and walked around the car to the passenger's side in order to retrieve a baseball bat. In response, the defendant exited the car, walked around the rear of the car toward the passenger's side, and fatally shot the victim. On appeal from the judgment of conviction, the Appellate Court reversed the defendant's conviction and remanded the case for a new trial. At the defendant's second trial, M testified, in an offer of proof outside the presence of the jury, that, immediately before the defendant's first trial, she encountered P in the courthouse, and P called M a "snitch" and threatened her. M then testified that, two days later, P's sister and two other individuals had assaulted her. The trial court denied the state's motion in limine to preclude M's testimony with respect to the courthouse encounter between P and M but granted the motion with respect to the assault. At the defendant's second trial, M testified before the jury that P ran by the apartment after the shooting and tossed L the black revolver that allegedly was used to shoot the victim and that was later found by the police. This testimony contradicted M's initial statement to the police about whom she saw with the gun and her testimony at the defendant's first trial. On direct appeal from the judgment of conviction after the defendant's second trial, *held*:

1. The defendant could not prevail on his claim that the trial court improperly excluded evidence that M was assaulted before the defendant's first trial:

a. The trial court's exclusion of evidence relating to the assault did not violate the defendant's sixth amendment rights to present a defense and to confrontation, as the court did not prevent the defendant from presenting evidence in furtherance of his third-party culpability claim or from challenging M's credibility; the defendant was permitted to present his version of the events to the jury and to elicit facts from which the jury could assess M's credibility, including her motive for testifying falsely at the defendant's first trial, as the jury heard M's testimony that P possessed the murder weapon on the day of the shooting, that M initially lied to the police because she was high and felt pressured, that she lied at the defendant's first trial because of P's threat, and that she was telling the truth at the defendant's second trial.

b. Even if this court assumed, without deciding, the trial court improperly precluded testimony relating to the assault of M, the defendant failed to meet his burden of proving harm; the testimony of eyewitnesses to the shooting that implicated the defendant, which was corroborated by video surveillance footage and the statements of P and L to the police shortly after the murder, M's statement to the police implicating the defendant, which was made prior to P's threat and the subsequent assault of M, and certain forensics testimony, when considered together, made it unlikely that any error relating to the preclusion of testimony regarding

State *v.* Torres

the specifics of the assault would have changed the result of the defendant's trial.

(*Three justices dissenting in one opinion*)

2. The defendant could not prevail on his claim that the trial court had violated his sixth amendment right to confrontation and the rules of evidence by preventing defense counsel from impeaching a state's witness, J, with evidence of J's prior criminal convictions; the trial court properly excluded evidence of J's misdemeanor larceny convictions as too remote, as the misconduct underlying those convictions was at least seventeen years old at the time of trial, and the court was permitted, but not required, to find that its remoteness outweighed its probative value.

Argued March 31, 2021—officially released May 10, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the case was tried to the jury before *B. Fischer, J.*; thereafter, the court granted in part the state's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Seth R. Garbarsky*, senior assistant state's attorney, and *Sean P. McGuinness*, assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Quavon Torres, appeals from the judgment of the trial court convicting him of the crimes of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The defendant's principal claim is that the trial court improperly excluded evidence of an assault of one of the state's witnesses, Tasia Milton. The defendant also claims that the trial court improperly prevented him from impeaching another state's witness, Teresa Jones, with evidence of certain previous

State *v.* Torres

criminal offenses. We disagree with both of these claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of July 23, 2012, the defendant, Freddy Pickette, and Marcus Lloyd were socializing with the defendant's cousin, Milton, and the defendant's sister, Amber Torres, in a third floor apartment located at 543 Orchard Street in New Haven. At around 7 p.m. that evening, Lloyd called the victim, Donald Bradley, and asked him for a ride to a housing project in New Haven. Shortly thereafter, the victim parked his car outside of a CVS Pharmacy (CVS) located across the street from the apartment, got out of the driver's seat, and went inside of the store. Moments later, the defendant, Pickette, and Lloyd walked through the parking lot and got into the victim's car. Pickette sat in the front passenger seat, Lloyd sat in the rear passenger seat, and the defendant sat in the rear seat on the driver's side of the car.

A short time later, the victim exited the store and got back into the driver's seat, but he did not initially notice that the defendant was the person sitting behind him. Pickette then asked the victim to stop at a Burger King located a short distance to the east along Whalley Avenue. When they got to the drive-through, the victim noticed that the defendant was in the car and told him to get out. When the defendant refused, the victim got out of the driver's seat, walked around to the passenger side of the car, opened one of the doors, and leaned inside in order to retrieve a baseball bat from under a seat. In response, the defendant got out of the car, walked around the trunk toward the passenger side, and fatally shot the victim four times.

The defendant, Pickette, and Lloyd fled the scene of the shooting, heading back west along Whalley Avenue and then up Orchard Street toward the third floor apart-

State *v.* Torres

ment where they had previously been socializing. The defendant and Lloyd ran into the apartment, where they once again encountered Milton and Amber Torres. Pickette split off from the others, crossed Orchard Street, ran through the CVS parking lot, and eventually continued walking west along Whalley Avenue. Once inside of the apartment, the defendant gave Amber Torres a black revolver with a wooden handle and told her "to do something with it . . . ." Amber Torres then picked up the revolver using a washcloth and placed it in a black bag.

The police arrived at the apartment soon thereafter, surrounded the building, and instructed everyone inside to vacate the premises. Eventually, the defendant and Lloyd exited the building and were arrested. During a search of the apartment, the police located a .38 caliber black revolver with a wooden handle in a black bag. Inside of the revolver were two live rounds and four empty chambers. Later, ballistics testing determined that the revolver was the gun used to shoot and kill the victim.

The defendant was subsequently charged with, and convicted of, the crimes of murder and carrying a pistol without a permit. On appeal, the Appellate Court reversed that conviction and remanded the case for a new trial. See *State* v. *Torres*, 175 Conn. App. 138, 154, 167 A.3d 365 (reversing defendant's conviction due to improper in-court identification), cert. denied, 327 Conn. 958, 172 A.3d 204 (2017), cert. denied,     U.S.    , 138 S. Ct. 1303, 200 L. Ed. 2d 474 (2018). The case was then presented to a jury for a second time, and the defendant was once again convicted of the crimes of murder and carrying a pistol without a permit. The trial court imposed a total effective sentence of fifty years of incarceration on those charges.[1] The defendant now appeals from that

---

[1] The trial court sentenced the defendant to fifty years of incarceration for the crime of murder and a concurrent sentence of five years of incarceration for the crime of carrying a pistol without a permit, for a total effective sentence of fifty years of incarceration.

State *v.* Torres

conviction directly to this court pursuant to General
Statutes § 51-199 (b) (3).

I

The defendant's first claim is that the trial court
improperly excluded evidence that Milton was physi-
cally assaulted in the days leading up to the defendant's
first trial. Specifically, the defendant argues that evi-
dence of this assault was necessary in order to explore
Milton's motives, interests, and bias, and that the exclu-
sion of that evidence violated the defendant's rights
under the sixth amendment to the United States consti-
tution. The defendant, in the alternative, also implicitly
presses the underlying claim of evidentiary error. For
the reasons that follow, we reject defendant's constitu-
tional claims and conclude that any evidentiary error
was harmless.

The following undisputed facts and procedural his-
tory are necessary to our consideration of these claims.
Before trial in the present case, the state filed a motion
in limine seeking to exclude "any and all evidence relat-
ing to an argument between . . . Pickette and . . .
Milton on August 14, 2014, and an assault [on] . . .
Milton on August 16, 2014 . . . ." In an accompanying
memorandum of law, the state argued that evidence
regarding the argument and the assault should be
excluded as irrelevant, inadmissible hearsay, inadmissi-
ble character evidence, and as unduly prejudicial. Defense
counsel responded that such evidence was "relevant
and [would go] to motive, interest, [and] bias of . . .
Milton to lie."

In response to the trial court's request for an offer of
proof, Milton testified outside of the presence of the
jury as follows. Just prior to the defendant's first trial,
Milton allegedly encountered Pickette and another indi-
vidual in the hallway of the courthouse. An argument
ensued, during which Pickette called Milton a "snitch"

State *v.* Torres

and said "they were going to whip [her ass]" if she testified. Milton responded to Pickette by asking, "how am I a snitch when we both [are] in the same predicament?" The second individual then said to Pickette, "don't argue with this girl, you have a sister named Ash Black . . . ." Two days later, Pickette's sister, Ashley Black, and two other individuals "jumped" and "beat on" Milton in New Haven. During this assault, Milton's assailants allegedly told her that she "should mind [her own] business" and mentioned "something about [Pickette] . . . ."

Following the offer of proof, defense counsel argued that the threat and the assault were admissible to show Milton's "motive, interest, bias with respect to [her] testimony, what may or may not have been said in the past, and . . . also . . . to [show the] state of mind and the consciousness of guilt of . . . Pickette . . . ." The trial court denied the state's motion in limine with respect to the argument between Pickette and Milton in the courthouse but granted the motion with respect to the assault of Milton in New Haven. The trial court reasoned that, because Pickette was involved in the argument in the courthouse hallway but not the assault, the connection between Milton's trial testimony and the latter was "too speculative . . . ." Specifically, the trial court reasoned: "Milton just indicated that one of these individuals said to her, mind your own business, nothing that's attributed to this case; that could be mind your own business concerning a domestic [situation] with [a] boyfriend [or] girlfriend. [It is] [f]ar too speculative, so it's not relevant evidence for this jury to hear."

Before the jury in the defendant's second trial, Milton testified that Pickette ran by 543 Orchard Street after the shooting and tossed Lloyd the gun that was later found by the police in the apartment. This testimony contradicted not only Milton's initial statement to the police about whom she saw with the gun but also her

State *v.* Torres

subsequent testimony during the defendant's first trial. Specifically, during her statement to the police on the night of the shooting, Milton said that she had seen the defendant giving the gun to Amber Torres and that she did not see Pickette after the shooting. Notwithstanding her initial statement to the police, Milton testified during the defendant's first trial that she never saw the defendant holding the gun. Milton, however, continued to maintain that she had not seen Pickette after the shooting. The state offered, and the trial court subsequently admitted, both Milton's statement to the police and her testimony from the first trial as prior inconsistent statements for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

Milton explained that her statement to the police on the night of the shooting implicated the defendant, her own cousin, rather than Pickette, a person she had never known before, because she was high, nervous, and felt "pressured by the cops." Milton also explained that she had lied at the defendant's first trial because she was afraid of Pickette. Specifically, on direct examination by the prosecutor, Milton gave the following specific testimony about Pickette's threats and the events that followed:

"Q. . . . [Y]ou had an incident with [Pickette] the last time you testified?

"A. Yes.

"Q. And was that here in court?

"A. Yes.

"Q. Where did that happen?

"A. In the hallway.

State *v.* Torres

"Q. In the hallway. And what happened? Tell the jury what happened there.

"A. We had an argument.

"Q. You and [Pickette]?

"A. Yes.

"Q. Tell us what happened.

"A. I don't remember what happened, I just know that me and him had an argument, it got ugly from there.

"Q. . . . [W]as it physical; did anyone hit anybody?

"A. Close enough.

"Q. Well, that's not the question, ma'am. Did anyone hit anybody else?

"A. No.

"Q. Okay. And you had said previously that you had been threatened?

"A. Yes.

"Q. . . . [T]ell the jury how you got threatened.

"A. He threatened me in the hallway, saying he was going to have someone come beat my ass.

"Q. Um-Hm.

"A. They didn't come. *They seen me on the street and then that's when it happened.*" (Emphasis added.)

Notwithstanding the trial court's evidentiary ruling earlier that same day relating to the assault, neither the prosecutor nor defense counsel objected to this testimony.

A

The defendant's primary contention in this appeal is that the trial court's exclusion of evidence related to the

State *v.* Torres

assault of Milton violated his sixth amendment rights to present a defense and to confront the witnesses against him. We disagree.

The following principles govern our review of the defendant's constitutional claims. "It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution . . . [which is] made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 593, 175 A.3d 514 (2018). A criminal defendant's "right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense." (Internal quotation marks omitted.) Id., 593–94.

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial [court] . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony." (Internal quotation marks omitted.) *State* v. *Leconte*, 320 Conn. 500, 511, 131 A.3d 1132 (2016).

"[W]hether a trial court's . . . restriction of a . . . [witness'] testimony in a criminal trial deprives a defen-

State *v.* Torres

dant of his [constitutional] right to present a defense is a question that must be resolved on a [case-by–case] basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial.'' (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014). In order to determine whether a defendant's constitutional right to cross-examination has been satisfied, ''[w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.'' (Internal quotation marks omitted.) *State* v. *Leconte*, supra, 320 Conn. 512.

On the basis of our thorough review of the record before us, we conclude that the exclusion of the assault evidence did not infringe on either the defendant's right to present a defense or his right to confront Milton. The defendant was permitted to present his version of the events to the jury and to elicit the essential facts from which the jury could assess Milton's credibility, which is what the constitution requires under these circumstances. The defendant's third-party culpability defense was, indeed, central to his theory of the case, but the jury heard Milton's testimony that Pickette was the one with the black revolver that day. Milton also testified that she initially lied to the police because she was high and felt pressured, that she lied at the defendant's first trial because of Pickette's threats, and that she was, at the defendant's second trial, telling the truth.

Because defense counsel was permitted to cross-examine Milton about her motive for testifying falsely at the defendant's first trial and to elicit testimony implicating Pickette, the trial court's exclusion of evidence

State *v.* Torres

pertaining to the assault did not violate the defendant's
sixth amendment rights. See, e.g., *State* v. *Jordan*, 329
Conn. 272, 287 n.14, 186 A.3d 1 (2018) (concluding that
"[t]he constitutional right to present a defense does
not include the right to introduce any and all evidence
claimed to support it" and that no constitutional viola-
tion occurred when "the trial court's exclusion of evi-
dence . . . did not prevent the defendant from
presenting other evidence that supported his theory
of [defense]"). As a result, defendant's constitutional
claims must fail.

B

We turn next to the underlying claim of evidentiary
error. Assuming, without deciding, that the trial court
improperly precluded additional testimony relating to
the assault of Milton, we conclude that the defendant
has failed to meet his burden of proving harm.[2] Specifi-
cally, we conclude that the accounts provided by wit-
nesses to the shooting itself, video surveillance footage
from various security cameras in the surrounding area
corroborating those observations, and Milton's state-
ment to the police implicating the defendant, which
was made prior to Pickette's threats and the assault,
considered together in the context of the record before
us as a whole, make it unlikely that any error relating
to the preclusion of further testimony about the assault
of Milton would have changed the result of the defen-
dant's trial.

"[W]hether [an improper ruling] is harmless in a par-
ticular case depends [on] a number of factors, such as
the importance of the witness' testimony in the [defen-

---

[2] As a result, we forgo any analysis of questions, such as relevancy, relating
to the predicate question of admissibility. See Conn. Code Evid. § 4-1. We
likewise note that, in the present appeal, the defendant has raised no claims
with respect to either the sufficiency of the state's evidence or the third-
party culpability instruction provided to the jury.

State *v.* Torres

dant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial.'' (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). Because this inquiry is evidentiary in nature, rather than constitutional, the defendant bears the burden of proving that the trial court's exclusion of evidence substantially swayed the jury's verdict. Id. Specifically, in order to prevail, the defendant must establish two distinct points: (1) that Milton's various statements about the events at 543 Orchard Street could have influenced the course of the jury's deliberations, and (2) that additional evidence about the assault of Milton, in particular, could have caused the jury to consider those statements in a different light.

In the present case, the state adduced testimony from two particular witnesses who were present at the scene of the shooting itself. The first of those witnesses, Lachell Hall, testified that she saw a car pull into the drive-through lane of a Burger King shortly before the shooting. She saw her nephew, Pickette, seated in the front passenger seat, wearing a black shirt.[3] Hall testified that there were two other people in the car, one seated behind the victim wearing a "[d]arker shirt" that "could've been . . . black," and another behind Pickette wearing a red shirt, but she apparently did not recognize either of them.

Hall testified that she greeted Pickette through a partially opened window as the victim's car was pulling

[3] Hall testified that she referred to Pickette as her nephew because her brother had children with Pickette's mother.

State *v.* Torres

up to the drive-through and that Pickette responded, "hey, Chell . . . ." After the car came to a stop next to the menu board, Hall saw the victim get out of the driver's seat and walk around the car, behind the trunk. Hall testified that the victim then opened a door on the passenger side of the car and bent over to reach inside for something. She was walking toward the car at the time and was only about twenty feet away when "somebody got out [of] the back seat, [who] was behind [the victim], and shot him . . . ." According to Hall, both Pickette and the person wearing the red shirt were still seated on the passenger side of the car when those shots were fired. Although Hall testified on cross-examination that she did not see the gun or exactly where the shots had come from, she stated that the person she had identified as the rear driver's side occupant had walked around to the rear of the car and was standing with his back to her at the moment of the shooting.

Hall's testimony about the initial positions of these individuals in the car was corroborated by video surveillance footage from a security camera located outside of a nearby CVS. Footage from that camera before the shooting shows (1) the victim's car pulling into the CVS parking lot and the victim exiting the driver's seat and walking into the CVS, (2) a person in a red shirt and shorts getting into the rear passenger side seat, (3) a person in a darker colored shirt, white shoes, and long pants getting into the rear driver's side seat, (4) a person wearing a black shirt with a white logo and shorts getting into the front passenger seat, and (5) shortly thereafter, the victim getting back into the driver's seat and the victim's car pulling out of the parking lot. Minutes after the shooting, video surveillance footage from that same store showed the person in the black shirt with the white logo and shorts crossing Orchard Street, running through the parking lot, and then walking west along Whalley Avenue. Because there is no

State *v.* Torres

dispute that the person running through the parking lot in this video recording was Pickette,[4] the jury could have easily inferred that Hall had correctly identified him as the occupant in the front passenger seat of the victim's car.

A second eyewitness, Jones, was walking from a grocery store located on the other side of Whalley Avenue to the Burger King with five of her children. As they were about to cross the street, Jones saw "some guys" standing around a car parked at the Burger King drive-through. Jones indicated that one of those people was wearing a red shirt and khakis and that another was wearing a "Canadian blue" shirt and jeans. Jones expressly testified that the person wearing the blue shirt "pulled out his gun and started shooting." Specifically, Jones told the jury that the shooter "was around the back of the vehicle, more near the passenger side," that she witnessed the shooter extending his arm to fire, and that she heard approximately five shots. Jones further testified that Pickette, whom she knew and recognized, was not the shooter.

Although the accounts provided by Hall and Jones differed in some respects, the description of the appearance and movements of the shooter that they provided to the jury both clearly implicated the defendant. Hall's testimony that the shooter had been seated directly behind the victim, in conjunction with video surveillance footage from the CVS parking lot, tends to exculpate the two people who were seated on the passenger side of the car. Although Hall testified that the shooter's shirt "could've been . . . black," she also testified that Pickette, the only other person who was wearing a black shirt that day, was not the shooter. Likewise,

_____

[4] The defendant and Lloyd, who was wearing a red shirt, were arrested at 543 Orchard Street shortly after the shooting. At trial, Pickette also identified himself as the person running through the CVS parking lot on the video recording.

State *v.* Torres

Jones' testimony that the shooter was wearing a "Canadian blue" shirt and long pants was sufficiently specific to exclude the other potential suspects inside of the car.[5] Video surveillance footage from a Subway restaurant moments after the shooting clearly shows the three men who had previously entered the victim's car in the CVS parking lot running away from the scene of the shooting in the following order: first, a man wearing a black shirt and shorts, second, a man wearing a red shirt and shorts, and, third, a man wearing long pants and a shirt consistent with the "Canadian blue" description provided by Jones. A conclusion that the person standing near the trunk had shot the victim, who was reaching into the passenger side of the car at the time, is, likewise, consistent with the absence of stippling[6] and the presence of blood on the inside of the rear passenger door of the victim's vehicle. Finally, the observations of the shooter provided by both Hall and Jones were also consistent with the initial statements provided by Pickette and Lloyd to the police shortly after the murder, which were admitted into evidence at trial pursuant to *Whelan*.[7] Milton's observations on the day of the murder were, by contrast, related only to the events at 543 Orchard Street. Those observations, although relevant, are less probative with respect to

_____

[5] Pickette was wearing a black shirt, and Lloyd was wearing a red shirt. Both of those two men were wearing shorts.

[6] At trial, Susan Williams, a physician employed by the Office of the Chief Medical Examiner, testified that she conducted the victim's autopsy and had observed no stippling during the course of her examination. Williams stated that this observation tended to indicate that the barrel of the gun was more than two feet away from the victim at the time of the shooting.

[7] Indeed, it is a rare case in which the jury is provided with direct testimony from a witness who is able to give a comprehensive, detailed account of all of the events surrounding a murder. More commonly, evidence is derived from a variety of sources, such as in-court testimony and *Whelan* statements, that are not perfectly consistent in all respects. The fact that the state's case required a comparison of multiple statements does not, however, compel the conclusion that the evidence against the defendant was weak.

the identity of the shooter than those from the eyewitnesses to the shooting itself.

The fact that Milton's initial statement to the police, which predated both Pickette's threats and the subsequent assault, failed to implicate Pickette provides another reason to conclude that any evidentiary error was harmless.[8] In order for the jury to have credited Milton's testimony in the present case that Pickette had brought the gun back to 543 Orchard Street, it would have had to conclude that Milton lied during her initial statement to the police when she said that it was the defendant who brought the gun back to the apartment after the shooting. Even if the defendant had been allowed to produce additional evidence to show that the assault of Milton had made her afraid to implicate Pickette at the first trial, that same fear would not have explained why, in her previous statement to the police, she chose to implicate the defendant, her own cousin, and not Pickette, a person she had not previously known.

In summary, we conclude that the defendant has not satisfied his burden of proving that the trial court's evidentiary error substantially swayed the jury's verdict. In our view, the accounts of the shooting from Hall, Jones, Lloyd, and Pickette, the video surveillance foot-

---

[8] By referring to Milton as a "snitch" and telling her to mind her own business, it is just as plausible that Pickette was trying to prevent Milton from implicating the defendant. Indeed, it was only *after* the assault that Milton began denying that she had seen the defendant with the gun on the day of the shooting. This understanding is consistent with (1) the fact that both Pickette and Lloyd initially declined to identify the defendant as the shooter at his first trial; see *State* v. *Torres*, supra, 175 Conn. App. 152; (2) Pickette's and Lloyd's inability to recall particular details of the shooting in the present trial and the subsequent admission of their initial statements to the police, which implicated the defendant, pursuant to *Whelan*, and (3) Milton's testimony during the offer of proof in the present case that she viewed herself as being in "the same predicament" as Pickette, namely, being called to testify against the defendant.

State *v.* Torres

age from security cameras in the surrounding area corroborating those accounts, and Milton's statement to the police, which implicated the defendant and predated both Pickette's threats and the subsequent assault, considered together, make it unlikely that additional evidence about the specifics of the assault would have caused the jury to have reached a different result. For these reasons, the defendant's claim of evidentiary error must also fail.

II

The defendant's second claim is that the trial court violated both his sixth amendment right to confrontation and our rules of evidence by preventing him from impeaching Jones with evidence of certain prior criminal convictions. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. As explained in part I B of this opinion, Jones was an eyewitness to the victim's murder. At trial, defense counsel sought to impeach Jones with her prior criminal history, which consisted of a felony assault conviction in 1997, and three misdemeanor larceny convictions in 2002. In particular, defense counsel claimed that the facts underlying Jones' 2002 larceny convictions were relevant to her character for truth and veracity. The prosecutor responded that "the underlying facts would certainly be collateral" and were "well beyond" the ten year limitation on the admissibility of prior criminal convictions. The trial court granted the state's motion to exclude Jones' criminal history on the ground "that these three matters are too remote in time. A felony conviction from 1997 is twenty-two years old, [and the convictions for] issuing a bad check [in] 2002, [are] seventeen years old. They're too remote in time, so I will not allow inquiries on that." See Conn. Code. § Evid. 6-7 (providing that witness may be impeached by "[a] crime . . . punishable by imprisonment for more than

State *v.* Torres

one year'' and that ''the court shall consider,'' among other things, ''the remoteness in time of the conviction'').

On appeal, the defendant renews his claim that the exclusion of Jones' 2002 misdemeanor larceny convictions was improper because these convictions were relevant to Jones' character for truth and veracity. The defendant further argues that he was deprived of his sixth amendment right to confront Jones because ''[h]e was foreclosed from exposing the jury to facts from which it could have appropriately drawn inferences relating to the reliability of Jones' eyewitness account.'' The state does not dispute that the evidence was relevant to impeach Jones' credibility but, instead, argues that ''[t]he trial court properly excluded [it] on the grounds of remoteness.'' We agree with the state.

We begin our analysis with the admissibility of the challenged evidence under the Connecticut Code of Evidence. See, e.g., *State* v. *Annulli*, 309 Conn. 482, 491, 71 A.3d 530 (2013). Sections 4-4 and 6-6 of the Connecticut Code of Evidence govern whether witnesses may be asked about specific conduct in order to impeach their character for truthfulness. ''These rules [prevent] the use of a general trait of character or propensity to prove that a person acted that way on a specific occasion . . . but make an exception for evidence of a witness' character for untruthfulness. Subdivision (3) [of § 4-4 (a)] authorizes the court to admit evidence of a witness' character for untruthfulness or truthfulness to attack or support that witness' credibility. . . . Section 6-6 addresses the admissibility of such evidence and the appropriate methods of proof. . . . Specifically, § 6-6 (b) (1) permits the questioning of a witness about instances of the witness' conduct if the conduct is probative of the witness' veracity. Conn. Code Evid. § 6-6 (b) (1) ([a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness).

State *v.* Torres

"[T]he right to cross-examine a witness pertaining to specific acts of misconduct is limited in three distinct ways. . . . First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance [on] the issue of veracity. . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 335 Conn. 720, 730, 240 A.3d 1039 (2020). Under the second limitation, which is the proviso at issue in the present case, even if specific acts of misconduct are indicative of a witness' lack of truthfulness and veracity, "[i]t does not follow . . . that . . . the court must permit the cross-examination. . . . In considering whether the court abused its discretion in this regard, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) Id., 731; see also *State* v. *Martin*, 201 Conn. 74, 88, 513 A.2d 116 (1986) (trial court has discretionary authority to disallow cross-examination on specific acts of misconduct if it determines that prejudicial effect of evidence outweighs its probative value). "We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818, 970 A.2d 710 (2009).

We conclude that the trial court did not abuse its discretion in excluding the 2002 misdemeanor larceny convictions as too remote. The more remote a witness' specific acts of misconduct, the less probative they are of the witness' current character for truth and veracity.

State *v.* Torres

Indeed, we previously have observed that remoteness alone, apart from any other consideration, may justify, although not require, the exclusion of specific acts of misconduct. *Vogel* v. *Sylvester*, 148 Conn. 666, 676, 174 A.2d 122 (1961); see also, e.g., *State* v. *James*, 211 Conn. 555, 571–72, 560 A.2d 426 (1989) ("[e]ven if the evidence did involve untruthfulness, the court was well within its discretion in excluding it because of its remoteness in time, its minimal bearing on credibility, and its tendency to inject a collateral issue into the trial"); *State* v. *Morgan*, 70 Conn. App. 255, 274, 797 A.2d 616 ("[a]lthough inquiry into . . . [specific] acts [of misconduct] might have borne on the issue of [the witness'] credibility, the court was free to determine, as it did, that the remoteness of the acts tended to outweigh their probative value"), cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002); E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.28.4, p. 390 ("even if the conduct does relate to veracity, the court still has discretion to exclude it if the evidence has slight relevance due to remoteness in time or other considerations"). The misconduct underlying Jones' 2002 misdemeanor larceny convictions was at least seventeen years old at the time of trial, and, under these circumstances, the trial court was permitted, but not required, to find that its remoteness outweighed its probative value. We therefore reject the defendant's claim that the trial court abused its discretion in excluding the challenged evidence.[9]

_____

[9] The defendant also claims that he is entitled to a new trial because of prosecutorial impropriety. Specifically, the defendant claims that he was deprived of a fair trial because the prosecutor made the following three statements in his rebuttal summation: (1) "[t]he shooter was seen on multiple occasions by multiple witnesses behind the driver's seat of this vehicle," (2) "[t]he shooter happened to be wearing a blue shirt and grey sweatpants that night," and (3) "[b]lue shirt, how they ran after-the-fact, arm extended; all of those are consistent . . . ."

None of these arguments rises to the level of prosecutorial impropriety. The first argument is adequately supported by Hall's testimony that "somebody got out the back seat that was behind [the victim] and shot him" and

State *v.* Torres

The judgment is affirmed.

In this opinion ROBINSON, C. J., and MULLINS and KELLER, Js., concurred.

ECKER, J., with whom McDONALD and D'AURIA, Js., join, dissenting. The defendant, Quavon Torres, was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 following a jury trial at which evidence central to his third-party culpability defense improperly was excluded. In light of the importance of the excluded evidence to the defendant's theory of the case, the lack of physical evidence implicating the defendant in the charged crimes, and the contradictory and inconsistent evidence adduced at

the initial statements given by Pickette and Lloyd to the police. The factual assertions in the second argument, likewise, can reasonably be inferred from Milton's description of the defendant's attire on that day, Jones' testimony that the shooter was wearing a blue shirt and long pants, and the undisputed fact that both Pickette and Lloyd were wearing shorts. Finally, although the defendant correctly notes that the third argument failed to expressly distinguish between Jones' testimony that the shooter's shirt was "Canadian blue" and Hall's testimony that the shooter's shirt was "[d]arker" and "could've been . . . black," the prosecutor had already expressly acknowledged that distinction in his initial summation, stating: "Now, granted, [Hall] tells the police that night that she thinks the shooter or the person that got out of the back driver's side is wearing a darker shirt or a black shirt, she's not exactly sure. She certainly wasn't expecting to see a shooting. It's understandable that she might mess up a few details, but she testifies that it was a dark colored shirt. Blue is a darker color."

Moreover, even if we were to agree that the prosecutor's arguments were imprecisely worded, none of the challenged statements drew an objection from defense counsel or was repeated. See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). The jury was also clearly instructed that representations made by counsel during closing summations were not to be considered as evidence and that it was the jury's recollection of the facts—not those of the attorneys—that controlled. As a result, we conclude that the defendant has failed to meet his burden of demonstrating that the alleged improprieties so infected the trial with unfairness as to deprive him of his constitutional right to a fair trial. See, e.g., *State* v. *Luster*, 279 Conn. 414, 442, 902 A.2d 636 (2006).

State *v.* Torres

trial, I conclude that the evidentiary error was harmful. Because I would reverse the judgment of conviction and remand the case for a new trial, I respectfully dissent.[1]

The majority opinion accurately sets forth the relevant facts and procedural history, but the following facts warrant particular emphasis. There was no physical evidence, such as DNA or fingerprint evidence, linking the defendant to the murder or the murder weapon, and, although there were eyewitnesses to the shooting, none of the eyewitnesses testified at trial that the defendant was the perpetrator of the charged crimes. Indeed, at trial, none of the state's witnesses implicated the defendant in either the commission of the murder or possession of the murder weapon; their inculpatory version of events came in the form of prior inconsistent statements introduced into evidence under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), thus requiring the jury to choose between conflicting accounts of events. The state's case, in short, depended on the credibility of the witnesses and, in particular, the reasons for various changes in those witnesses' versions of events over time.

At trial, the fundamental question for the jury was the identity of the individual who had shot and killed the victim, Donald Bradley. The state claimed that the defendant was the shooter, but the defendant raised a third-party culpability defense, arguing that Freddy Pickette was the guilty party. According to the defendant's theory of the case, Pickette shot and killed the victim and brought the gun back to 543 Orchard Street

_____

[1] I see no need to reach the defendant's prosecutorial impropriety claims. To the extent that the defendant's claim regarding the exclusion of evidence of Teresa Jones' specific acts of misconduct would be likely to arise on remand, I agree with the majority that a trial court has broad discretion to exclude such evidence on the basis of its remoteness in time. See part II of the majority opinion.

343 Conn. 208 MAY, 2022 231

State *v.* Torres

in New Haven after he fled the scene. The trial court considered the defendant's third-party culpability defense, supported by the testimony of his cousin, Tasia Milton,[2] to be strong enough to warrant submission to the jury.

Milton testified at trial that she was sitting outside of 543 Orchard Street when she heard gunshots and saw the defendant and Marcus Lloyd running toward her with "[Pickette] a little behind them." Although Pickette did not enter the building, he ran by 543 Orchard Street and tossed a gun to Lloyd. The defendant and Lloyd entered the building and ran up to the third floor apartment in which they and Pickette had been socializing together earlier in the evening. Milton testified that she had "never seen [the defendant] with the gun" but that she saw Pickette with the gun earlier that day.

Milton's trial testimony was inconsistent in part with her statement to the police on the night of the murder, as well as her testimony at the defendant's first trial.[3] On the night of the murder, Milton reported to the police that, after hearing gunshots, she fled upstairs to the third floor apartment of 543 Orchard Street, quickly followed by the defendant and Lloyd. According to Milton's statement to the police, Pickette did not return

---

[2] Milton was not the only witness with a familial relationship to the defendant or Pickette. Amber Torres, who testified on behalf of the state, is the defendant's sister. Additionally, the two eyewitnesses to the shooting, Lachell Hall and Teresa Jones, both are related to Pickette. Hall is Pickette's aunt; see footnote 10 of this opinion; and Jones testified that she had known Pickette "since he was a child" because her "nephew is his brother."

[3] The defendant was convicted at the first trial of murder and carrying a pistol without a permit. On appeal, the Appellate Court reversed the defendant's conviction and remanded the case for a new trial. See *State* v. *Torres*, 175 Conn. App. 138, 154, 167 A.3d 365 (2017) (reversing defendant's conviction because witness made suggestive in-court identification, contrary to *State* v. *Dickson*, 322 Conn. 410, 453, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017)), cert. denied, 327 Conn. 958, 172 A.3d 204 (2017), cert. denied, U.S. , 138 S. Ct. 1303, 200 L. Ed. 2d 474 (2018).

State *v.* Torres

to the apartment after the shooting. She stated that the
defendant gave his sister, Amber Torres, a black gun
with a wooden handle and told her to "do something
with [it]." Milton testified at the defendant's first trial
substantially in conformance with these statements.[4]

At the defendant's second trial, the state introduced
Milton's prior inconsistent statement to the police and
trial testimony as substantive evidence of the defen-
dant's guilt and to undermine Milton's credibility, which
was central to the defendant's third-party culpability
defense. The state pointed out that Milton had not pre-
viously informed the police or testified that Pickette
tossed the gun to Lloyd following the shooting, contrary
to her testimony at the defendant's second trial. The
defendant sought to rehabilitate Milton's credibility and
to bolster his third-party culpability defense by eliciting
testimony from Milton that, when she gave her state-
ment to the police, she was young, "high," "nervous,"
and felt "pressured by the cops . . . ." Additionally,
Milton testified that she did not mention Pickette's pos-
session of the gun at the defendant's first trial because
"[Pickette had] threatened [her] in the [courthouse]
hallway, saying [that] he was going to have someone
come beat [her] ass."

The evidentiary issue at the center of the present appeal
arises because, although the defendant was permitted
to adduce evidence of Pickette's threat to Milton, he
was precluded from presenting evidence that she also
had been physically assaulted by Pickette's sister two
days later, consistent with the threat made by Pickette

---

[4] Although Milton denied seeing the defendant or anyone else holding a
gun, she testified at the first trial that she heard reference to it when the
defendant and Lloyd returned to the third floor apartment at 543 Orchard
Street following the shooting and the defendant told Amber Torres to "just
do something" with the gun. Consistent with her prior statement to the
police, Milton testified at the first trial that Pickette never returned to
the apartment.

343 Conn. 208 MAY, 2022 233

State *v.* Torres

and his compatriot. The state moved to preclude the evidence of the physical assault on the grounds that it was irrelevant, inadmissible hearsay, inadmissible character evidence, and unduly prejudicial. Defense counsel opposed the state's motion, arguing that the physical assault of Milton was "relevant and [went] to [Milton's] motive, interest, [and] bias . . . to lie [at the first trial]."

Milton testified as follows outside the presence of the jury in response to the trial court's request for an offer of proof: Just prior to the defendant's first trial, Milton encountered Pickette and a female witness in the hallway of the courthouse. An argument ensued, during which Pickette called Milton a "snitch" and said that "they were going to whip [her ass]" if she testified. The female witness said to Pickette, "don't argue with [Milton], you have a sister named Ash Black . . . ." Two days later, Pickette's sister, Ashley Black, and two other individuals "jumped" and "beat on" Milton in the Fair Haven section of New Haven. During the assault, Milton's assailants told her that she "should mind [her own] business" and mentioned "something about [Pickette] . . . ." Both events occurred days before Milton was called to testify at the defendant's first trial.

Following the offer of proof, the trial court ruled that Pickette's threats to Milton in the courthouse were relevant and admissible, but the physical assault of Milton in Fair Haven was not. The trial court reasoned that Pickette was involved in the argument but was not involved in the assault and that the connection between Milton's trial testimony and the assault was "far too speculative. . . . The witness . . . Milton, just indicated that one of these individuals said to her, 'mind your own business.' Nothing that's attributed to this case. That could be mind your own business concerning a domestic with [a] boyfriend, [a] girlfriend. Far too speculative, so it's not relevant evidence for this jury

State *v.* Torres

to hear.'' As a result, the defendant was prohibited at his second trial from rehabilitating Milton's credibility and bolstering his third-party culpability defense by presenting evidence that Milton had been assaulted by Pickette's sister shortly before Milton testified at the defendant's first trial.

The defendant claims on appeal that the trial court improperly excluded evidence of the assault because it was ''relevant and material to the defendant's third-party culpability [defense] that Pickette was the shooter,'' as well as to Milton's ''motive not to implicate Pickette during the defendant's first . . . trial and . . . to rehabilitate her credibility at the defendant's second trial, and explain why she did not previously implicate Pickette.'' The defendant further contends that the evidentiary error was harmful because Milton's testimony was the ''strongest evidence in support of his third-party culpability claim.'' I agree.

The trial court indisputably has wide discretion to determine the relevancy of evidence, and, under the abuse of discretion standard, every reasonable presumption must be made in favor of upholding the court's ruling. See, e.g., *State* v. *Best*, 337 Conn. 312, 318, 253 A.3d 458 (2020). That said, it is axiomatic that relevant evidence is admissible unless ''otherwise provided by the constitution of the United States, the constitution of the state of Connecticut, the [Connecticut] Code [of Evidence], the General Statutes or the common law.'' Conn. Code Evid. § 4-2. This rule reflects a cornerstone principle of evidence law.[5]

---

[5] See, e.g., *Curtis* v. *Bradley*, 65 Conn. 99, 109, 31 A. 591 (1894) (''[b]eing relevant, [the evidence] must be admitted, unless excluded under some legal principle, or rule of public policy, which forbids the admission of certain classes of evidence, no matter how relevant and material''); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.1.4, pp. 145–46.

State *v.* Torres

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence." (Internal quotation marks omitted.) *State* v. *Best*, supra, 337 Conn. 317; see Conn. Code Evid. § 4-1. To be relevant, evidence need not be conclusive or even compelling. See, e.g., E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.1.4, p. 146 ("[a] party is not required to offer such proof of a fact that it excludes all other hypotheses"). "All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429, 64 A.3d 91 (2013).

It is well established that third-party culpability evidence is relevant if there is "a direct connection between a third party and the charged offense . . . ." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 810, 91 A.3d 384 (2014). "Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination." (Internal quotation marks omitted.) Id., 811. In the present case, it is undisputed that there was a direct connection between Pickette and the charged crimes in light of Milton's testimony that Pickette ran by 543 Orchard Street and tossed Lloyd the gun used to murder the victim. Indeed, the defense theory was sufficiently strong that the trial court instructed the jury regarding the defendant's claim that a "third party . . . Pickette, may be responsible for the crimes the defendant is charged with committing . . . ."[6] See, e.g., *State* v.

[6] The trial court instructed the jury: "There has been evidence that a third party, not the defendant, committed the crimes for which the defendant is charged. This evidence is not intended to prove the guilt of the third party

*Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007) (holding that defendant was entitled to third-party culpability instruction only "if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime").

The direct connection between Pickette and the charged crimes does not resolve the evidentiary issue, however, because "[t]he general rule is that threats [or assaults] against witnesses are not relevant and are thus inadmissible as evidence . . . ."[7] *State* v. *Walker*, 214 Conn. 122, 129, 571 A.2d 686 (1990). *Walker* also delineated two exceptions to this general rule. See id., 129–30. First, evidence of threats or assaults against a witness is relevant and admissible if the defendant is linked in some way to the making of the threats or assaults. "[E]vidence of threats [or assaults] against witnesses is generally admissible either on the theory that such conduct is inconsistent with the defendant's claim of innocence or on the theory that the making of such threats [or assaults] evinces a consciousness of guilt. . . . Obviously, if the threats [or assaults] cannot be linked to the defendant, evidence of such [conduct] directed toward a witness would be of no probative

---

but is part of the total evidence for you to consider. The burden remains on the state to prove each and every element of the offense beyond a reasonable doubt. It is up to you and to you alone to determine whether any of this evidence, if believed, tends to directly connect a third party to the crimes with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence, you have left in your mind reasonable doubt indicating that the alleged third party . . . Pickette, may be responsible for the crimes the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the [defendant]."

[7] Although *Walker* involved verbal threats against a witness rather than a physical assault, the parties do not dispute that the principles elucidated in *Walker* are applicable to this case.

State *v.* Torres

value for those purposes.'' (Citations omitted.) Id., 129.
Second, such evidence is relevant and admissible,
regardless of the connection to the defendant, to explain
a witness' prior inconsistent statements and to rehabili-
tate the witness' credibility. ''A witness who has been
impeached by the admission of a prior inconsistent
statement is generally entitled to explain such contra-
dictory statement. . . . Pursuant to the rule permitting
explanations of prior inconsistent statements, it is gen-
erally held that evidence of threats [or assaults] to a
witness or fear on the part of a witness, in order to
explain an inconsistency, is admissible in criminal cases
for credibility rehabilitation purposes even if the [con-
duct] or fear [has] not been linked to the defendant [or
the allegedly culpable third party].'' (Citations omitted;
internal quotation marks omitted.) Id., 130.

Both *Walker* exceptions apply in the present case.
*Walker* articulated the first exception in the context of
threats against a witness allegedly attributable to the
defendant in that case; see id., 128, 131; but it applies
equally when the threats or assaults are allegedly attrib-
utable to an individual who is the subject of a defen-
dant's third-party culpability defense. Thus, once it has
been established that there is a direct connection
between the allegedly culpable third party and the
crimes charged and that there is a link between the
allegedly culpable third party and the threats or assaults
on a witness, such evidence is relevant to a defendant's
third-party culpability defense.

The evidence was more than sufficient to establish a
clear link between Pickette and the assault. The record
reflects that, prior to the defendant's first trial, while
Milton was waiting in the courthouse hallway in connec-
tion with the present case, Pickette called her a ''snitch,''
and he and another witness threatened ''to whip [her
ass]'' if she testified. The other witness told Pickette
not to ''argue with [Milton]'' because he has ''a sister

named Ash Black . . . .'' Two days later, Milton was assaulted by three individuals, one of whom was Pickette's sister, Ashley Black. During the assault, Milton's assailants told her to ''mind [her own] business'' and mentioned ''something about [Pickette] . . . .'' Given the temporal proximity between the threats and the assault, and the facts that Pickette's sister was one of the assailants and that Pickette was mentioned during the assault, it is entirely reasonable for the defendant to posit to the jury the inference that Pickette carried out his threat ''to whip [Milton's ass]'' by sending his sister to assault Milton prior to her testimony at the defendant's first trial. See, e.g., *State* v. *Robertson*, 254 Conn. 739, 756–57, 760 A.2d 82 (2000) (evidence was sufficient to link defendant to threats against witness because defendant stated in recorded conversation that ''someone 'need[s]' to talk to [the witness who was threatened] 'some more' ''); *State* v. *Taft*, 25 Conn. App. 578, 584–85, 595 A.2d 918 (evidence was sufficient to link defendant to threats against witness because, one day before trial, witness was approached by two men who shoved him ''against his car and said, 'we have a message from [the defendant], don't show up tomorrow' ''), cert. denied, 220 Conn. 921, 598 A.2d 144 (1991). Far from being speculative, Pickette's connection to the assault seems likely on this record. Accordingly, the assault of Milton was relevant and admissible to demonstrate Pickette's culpability in the commission of the charged crimes and his consciousness of guilt.

Even in the absence of a link between Pickette and the assault, the evidence also was admissible under the second exception set forth in *Walker* because it was relevant to explain Milton's prior inconsistent statement and to rehabilitate her credibility. See *State* v. *Walker*, supra, 214 Conn. 130. The fact that Milton was assaulted by Pickette's sister just days before Milton's testimony at the defendant's first trial was probative of Milton's

State *v.* Torres

state of mind at the time she testified at that trial. This
evidence supports a reasonable inference that Milton
had a motive to avoid implicating Pickette in the com-
mission of the crimes charged by testifying falsely at
the first trial. See, e.g., *State* v. *Alvarez*, 216 Conn. 301,
320, 579 A.2d 515 (1990) (evidence of witness' fear was
admissible "to show that [the witness] was afraid and
therefore had a motive to testify falsely"); *State* v.
*Walker*, supra, 214 Conn. 131 (evidence of threats against
witness was admissible and "relevant to show [the wit-
ness'] state of mind"); *State* v. *Talton*, 63 Conn. App.
851, 855–57, 779 A.2d 166 (evidence that witness feared
retaliation for identifying defendant properly was
admitted into evidence to explain witness' prior incon-
sistent statement and to rehabilitate witness' credibil-
ity), cert. denied, 258 Conn. 907, 782 A.2d 1250 (2001).
For the same reason, evidence of the assault was rele-
vant and admissible to rehabilitate Milton's inconsistent
testimony during the second trial that it was Pickette,
rather than the defendant, who possessed the murder
weapon after the shooting. The defendant was entitled
to argue that her testimony changed because the fear
caused by the assault prior to the first trial had dissi-
pated by the time of the second trial, and, accordingly,
contrary to the state's contention, her testimony at the
second trial was more credible. I therefore conclude
that the trial court abused its discretion in excluding
evidence of the assault.

I disagree with the majority that the error was harm-
less because, in my view, the defendant has met his
burden of demonstrating harm.[8] See part I B of the
majority opinion. "[W]hether [an improper ruling] is
harmless in a particular case depends [on] a number

─────────

[8] Because the defendant has fulfilled his burden of demonstrating harm,
I see no need to address whether the evidentiary error rose to the level of
a constitutional violation. Accordingly, I express no opinion on the conclu-
sions reached in part I A of the majority opinion.

State *v.* Torres

of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). Although the question is a close one, after considering the foregoing factors and the trial as a whole, I am persuaded that the evidentiary error affected the jury's verdict on this record.

Milton's testimony was essential to the defendant's third-party culpability defense that it was Pickette who murdered the victim and brought the gun back to 543 Orchard Street. As I previously explained, the central issue in the case was the identity of the perpetrator; Milton's testimony, which placed the murder weapon in Pickette's hands immediately after the shooting, was persuasive evidence of Pickette's guilt, and she was the only witness who connected the gun to Pickette. Milton was thus a critical witness in support of the defendant's third-party culpability defense, and her credibility and motive to testify falsely at the defendant's first trial were crucial issues to be resolved by the jury. The fact that Milton had been physically assaulted by Pickette's sister just days before she testified at the defendant's first trial, consistent with Pickette's earlier threat "to whip [her ass]" if she testified, would have illustrated

State *v.* Torres

to the jury the extent of Milton's motive to testify falsely at the first trial to avoid implicating Pickette. Because this evidence was vital to the jury's assessment of Milton's credibility, the defendant's third-party culpability defense, and the pivotal issue of identity, I believe that its improper exclusion was harmful.[9] See, e.g., *State* v. *Fernando V.*, supra, 331 Conn. 223–24 ("[when] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error" (internal quotation marks omitted)); *State* v. *Cerreta*, 260 Conn. 251, 265, 796 A.2d 1176 (2002) (improper exclusion of third-party hair and fingerprint evidence was not harmless because it "would have given cre-

---

[9] The majority suggests that the exclusion of the assault of Milton was harmless because "it is just as plausible that Pickette was trying to prevent Milton from implicating the defendant," and, therefore, Pickette's threatening and assaultive conduct may have been intended to protect the defendant, rather than Pickette himself. Footnote 8 of the majority opinion. The state does not rely on the explanation now offered by the majority, and for good reason. On the night of the shooting, Pickette exculpated himself in the charged crimes by telling the police that the defendant had shot the victim, and, therefore, I find Pickette's alleged charitable motive to be dubious at best.

To support its plausibility argument, the majority relies on Pickette's testimony at the defendant's first and second trials, in which Pickette declined to identify the defendant as the shooter, as well as Milton's testimony during the offer of proof that, when she was threatened in the courthouse hallway, "she viewed herself as being in 'the same predicament' as Pickette, namely, being called to testify against the defendant." Footnote 8 of the majority opinion. The majority's reliance on Pickette's testimony at the defendant's first trial and Milton's testimony during the offer of proof (which occurred outside the presence of the jury) is misplaced because this testimony was not admitted into evidence for the jury's consideration. In conducting a harmless error analysis, "we must examine the impact of the . . . [excluded] evidence on *the trier of fact and the result of the trial*"; (emphasis added; internal quotation marks omitted) *State* v. *Fernando V.*, supra, 331 Conn. 215; in light of the evidence properly before the jury. See *State* v. *Thompson*, 305 Conn. 806, 823 n.16, 48 A.3d 640 (2012) ("[harmless error] review must be confined to the record"). The jury was unaware of Pickette's testimony at the defendant's first trial or Milton's testimony during the offer of proof, and I fail to see how the jury could have drawn any inferences, plausible or otherwise, on the basis of testimony it never heard.

State *v.* Torres

dence to the defendant's claim of innocence''); *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993) (''[t]he exclusion of evidence bearing on the motivation of a chief witness for the state, particularly when no other evidence corroborated material aspects of the witness' testimony, is harmful error''); *State* v. *Rinaldi*, 220 Conn. 345, 357–58, 599 A.2d 1 (1991) (improper exclusion of evidence central to defendant's defense that he was not source of semen found in sexual assault victim was not harmless error).

The state's case against the defendant was not particularly strong. The eyewitnesses to the murder provided conflicting accounts as to the details surrounding the shooting and the identifying characteristics of the shooter. Lachell Hall, Pickette's aunt,[10] testified that she saw Pickette sitting in the front passenger seat of the victim's vehicle as it drove through the Burger King drive-through lane. Hall saw the car stop and the victim exit the driver's seat, walk around the back of the vehicle, and reach for something inside. She also saw a black man wearing a black or dark colored shirt exit the rear passenger seat on the driver's side of the vehicle. Hall heard three to four gunshots, but she did not see a gun and could not tell from what direction the gunshots were fired. Hall did not see the shooter and could not identify the passenger in the rear of the vehicle.

Teresa Jones also witnessed the shooting. Jones was exiting the supermarket across the street from the Burger King when she saw ''some guys standing around a car'' talking in the Burger King drive-through lane. One of the men, who was standing near the trunk of the vehicle wearing a ''Canadian blue'' shirt and blue jeans, pulled out a silver gun and shot into the car

---

[10] Hall testified that she had known Pickette ''[s]ince he was a kid'' and that she ''claim[s] him as [her] nephew'' because her ''brother [has] kids with his mother . . . .''

State *v.* Torres

approximately five times. Immediately afterward, the
shooter and an individual wearing a red shirt ran in the
direction of Orchard Street. When Jones later viewed
a photographic array prepared by the police, she was
unable to identify the defendant as one of the men
involved in the shooting. Jones did identify Pickette,
whom she referred to as Freddy Morrison,[11] as one of
the men standing around the victim's vehicle prior to
the shooting. Jones informed the police that the shooter
looked like Freddy Morrison but was not Freddy
Morrison.

The testimony of Hall and Jones differed in certain
critical respects.[12] According to Hall, someone wearing
a black or dark colored shirt exited the rear passenger
seat of the victim's vehicle immediately prior to the
shooting,[13] but, according to Jones, the shooter was
standing outside of the car talking with other individuals
immediately prior to the shooting. Hall testified that
Pickette was seated in the front passenger seat of the
car when the shooting occurred, but Jones testified that
he was standing outside of the vehicle. Hall testified that
the occupant of the rear passenger seat was wearing a
black or dark colored shirt, but Jones testified that the

---

[11] Pickette testified that his grandfather's last name is Morrison.

[12] A third witness, Dominique Padilla, also testified at the defendant's trial.
Padilla did not witness the shooting but testified that she heard three to
four gunshots from the direction of Burger King as she was exiting the
parking lot of a nearby McDonald's. Afterward, she saw two dark skinned
kids run by, one wearing a red shirt and the other a blue shirt. Padilla was
unable to identify the defendant, Pickette, or Lloyd as the individuals she
saw running away from Burger King that night.

[13] In my view, Hall's testimony about the initial positions of the defendant,
Pickette, and Lloyd in the victim's vehicle was not corroborated by footage
from a security camera located outside of a nearby CVS Pharmacy. Given
the poor quality of the footage and the fact that both the rear driver's side
and front passenger's side occupants were wearing dark colored shirts, it
is difficult to discern in the footage which individual is the defendant and
which is Pickette. The most that can be said of the footage is that it supports
a reasonable inference that either the defendant or Pickette was seated in
the rear passenger seat of the vehicle prior to the victim's murder.

State *v.* Torres

shooter was wearing a Canadian blue shirt. Further-more, Jones testified that the murder weapon was sil-ver, whereas the undisputed evidence adduced at trial established that the murder weapon was black with a wooden handle. Neither Hall nor Jones was able to identify the defendant as the individual who had shot and killed the victim.

Thus, we have a crime with no direct or uncontro-verted evidence to establish the shooter's identity. The defendant's DNA and fingerprints were not found on the gun used to commit the murder, and the video evidence does not show who shot the victim. There were multiple eyewitnesses, but none of them alone provided a comprehensive account of the shooting.[14] None of the eyewitnesses, moreover, testified that the defendant was the perpetrator of the charged crimes. All of the relevant witnesses gave testimony that materi-ally conflicted with either the testimony of another wit-ness or their own prior testimony. And most of the witnesses either had a direct interest in the outcome as potential suspects (Pickette and Lloyd), or were related to the defendant or Pickette. See footnote 2 of this opinion. As a result, this was a case in which every significant piece of evidence relevant to witness credi-bility, the identity of the shooter, and the defendant's third-party culpability defense was important to the jury's verdict.

---

[14] The majority states that "it is a rare case in which the jury is provided with direct testimony from a witness who is able to give a comprehensive, detailed account of all of the events surrounding a murder." Footnote 7 of the majority opinion. This observation misses the point. The majority's focus on the importance of the eyewitness testimony and its conclusion that this testimony is more "probative with respect to the identity of the shooter" than Milton's testimony requires a critical assessment of the strength of the state's eyewitness evidence. Part I B of the majority opinion. The present case involved eyewitness testimony that was conflicting and, at times, contra-dicted by the undisputed evidence in the record. The inconsistent nature of the eyewitness testimony undermines the overall strength of the state's case and casts doubt on the majority's reliance on this selective evidence to conclude that the evidentiary error was harmless.

State *v.* Torres

I do not dispute that the majority pieces together a version of the varying witness accounts to create a sufficient evidentiary basis to support the defendant's conviction, but the legal sufficiency of the evidence is not the issue, and the majority's marshaling of evidence sufficient to support the conviction misapprehends the point of harmless error analysis. "Legal sufficiency of the evidence is not the test for harmless error even if only a nonconstitutional error is involved. The harmlessness of an error depends [on] its impact on the trier and the result''; *State* v. *Bruno*, 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.*, concurring), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); not on whether the evidence, when viewed in the light most favorable to the jury's verdict, was sufficient to support an inference of guilt.

To ascertain the impact that the excluded evidence would have had on the jury, it is important to focus on the quality of the state's evidence. Although there was significant testimony from multiple sources implicating the defendant, the persuasive force of every inculpatory statement was weakened by a countervailing, contradictory, or conflicting statement, usually from the same witness. For example, during Pickette's and Lloyd's testimony at the defendant's trial, neither implicated the defendant in the commission of the charged crimes, although they previously had identified him as the shooter.[15] Similarly, the defendant's sister, Amber Tor-

---

[15] Pickette testified that he did not see a gun, did not see the defendant get out of the vehicle, and did not see who shot the victim. Pickette's prior inconsistent statement to the police that the defendant exited the vehicle and shot the victim with a black gun was admitted into evidence under *State* v. *Whelan*, supra, 200 Conn. 753.

Lloyd testified that he did not remember the murder because it was years ago and he was on drugs at the time. Lloyd's prior inconsistent statement to the police, in which he informed the police that the defendant had a gun, had exited the vehicle after the victim got out, and later had given the gun to Amber Torres after they fled to Orchard Street, was admitted into evidence under *Whelan*.

State *v.* Torres

res, testified that she was unable to remember anything about the day of the murder, but her prior inconsistent statement that she found a gun in the apartment after the shooting was admitted into evidence under *Whelan*.[16] The case against the defendant was built on a patchwork of facts and inferences derived from the inconsistent testimony of numerous witnesses; no single piece of evidence carried dispositive force, and the addition of Milton's excluded testimony to the mosaic may well have substantially swayed the jury's verdict.

Lastly, the fact that Milton failed to implicate Pickette in her initial statements to the police in no way renders the evidentiary error harmless. Milton, like many witnesses, including Pickette, Lloyd, and Amber Torres,[17] gave in-court testimony that differed significantly from a prior recitation of events. She candidly acknowledged that she lied to the police in 2012, but testified that she did so because she was young, "high," "nervous," and felt "pressured by the cops . . . ." It was up to the jury to sift through these shifting narratives and to decide what portion, if any, of these witnesses' testimony and prior statements were worthy of belief. To perform the essential function of assessing the believability of Milton's testimony, on which the defendant's third-party culpability defense largely depended, the jury needed all of the information pertinent to Milton's credibility, including evidence of Milton's assault prior to the defendant's first jury trial. See *State* v. *Fernando V.*, supra, 331 Conn. 223 ("[i]t cannot be harmless error to remove from the fact finder the very tools by which to make a credibility determination" (internal quotation marks omitted)); see also *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("because the jury has the

---

[16] Amber Torres informed the police that, after the shooting, she found a gun lying on the couch in the back bedroom of the third floor apartment and that she used a washcloth to move the gun to a black bag.

[17] See footnotes 15 and 16 of this opinion.

opportunity to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility, [i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony" (internal quotation marks omitted)).

In light of the conflicting and contradictory statements by the state's witnesses and the lack of physical evidence, I conclude that the improper exclusion of evidence of Milton's assault was harmful to the defendant's third-party culpability defense and that a new trial is required. Accordingly, I dissent.

———————————————